# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TOWNSHIP OF TINICUM, COUNTY
OF DELAWARE, PENNSYLVANIA
            Plaintiffs,

v.

CITY OF PHILADELPHIA
            Defendant.

Civil Action

No. 09-02872

Pollak, J.                                          August ⟨27⟩, 2010

## OPINION

Now before the court is plaintiffs' motion for judgment on the pleadings and

defendant's cross-motion for judgment on the pleadings. For the reasons that follow, I

will deny plaintiffs' motion and grant defendant's cross-motion.

## I.

This case revolves around the proposed expansion and reconfiguration, as set forth

in the FAA's Capacity Enhancement Plan, of the runway system at Philadelphia

International Airport ("PHL"), an airport owned and operated by the defendant City of

Philadelphia. Compl. ¶ 9; DEIS S-2[1] (docket no. 1). On May 26, 2009, plaintiffs—the

---

[1] "DEIS" refers to the Executive Summary of the Draft Environmental Impact Statement, which was attached as Exhibit A to the Complaint.

Township of Tinicum and Delaware County, the county of which Tinicum Township is a part–filed a complaint against the City of Philadelphia in the Delaware County Court of Common Pleas pursuant to Pennsylvania's Declaratory Judgments Act, 42 P.S. §§ 7531-7541. The complaint challenges a proposed airport Capacity Enhancement Plan ("CEP") for the airport (drawings of present airport and of two alternative proposed expansion and reconfiguration plans as Appendix A).

Currently, the airport occupies approximately 2,300 acres of land southwest of Philadelphia. Compl. ¶ 14. The majority of the airport is located in the City of Philadelphia, but part of it lies in Tinicum Township, Delaware County. PHL serves thirty passenger airlines and six cargo airlines. DEIS S-2. The airport and its facilities consist of: (1) seven terminals with 2.5 million square feet of passenger handling facilities; (2) 107 domestic gates; (3) 13 international gates; (4) airplane hangars; (5) deicing facilities; (6) fuel facilities; (7) a fire training facility, (8) an 11,300-space parking garage and surface parking lots; (9) rental car facilities; (10) a Southeastern Pennsylvania Transportation Authority (SEPTA) rail line with four regional stations; and (11) a United Parcel Service shipping facility. DEIS S-2. In 2007, the airport handled 499,682 aircraft operations and 32 million passengers. DEIS S-2.[2]

These figures made PHL the tenth busiest airport in the country and the sixth-most

_____

[2] The airport has been designated a "large hub airport." Countercl. ¶ 9. A large hub airport is a "commercial service airport . . . that has at least 1.0 percent of the passenger boardings," meaning "revenue passenger boardings in the United States in the prior calendar year." 49 U.S.C. § 47102(10), (14).

delayed airport in the United States that year. DEIS S-2. The Federal Aviation Administration has determined that PHL is a "congested airport" as defined in 49 U.S.C. § 47175(2), meaning that the airport "accounted for at least 1 percent of all delayed aircraft operations in the United States in the most recent year for which such data is available." CounterCl. ¶ 7 (docket no. 4). According to the FAA, the delays at PHL affect the "national airspace system." These "delays impose substantial costs in time and money for passengers and airlines, cargo shippers, and for other users of the air transportation system, as these delays spread throughout the [national airspace system]." DEIS S-3. Moreover, "delays are predicted to worsen in the future as aviation demand increases." DEIS S-2. If no changes other than regular upkeep are made to the airport, there will be delays of 19.3 minutes per aircraft operation in 2020, and 19.1 minutes delay in 2025. DEIS S-6.

In an effort to alleviate the congestion and delays at PHL, the FAA and the City initiated a "capacity enhancement project" pursuant to 49 U.S.C. § 40104 (a), (c).[3] The

---

[3] CEPs are subject to an "expedited and coordinated environmental review process" which must:

(1) provide[] for better coordination among the Federal, regional, State, and local agencies concerned with the preparation of environmental impact statements or environmental assessments under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(2) provide[] that all environmental reviews, analyses, opinions, permits, licenses, and approvals that must be issued or made by a Federal agency or airport sponsor for such a project will be conducted concurrently, to the maximum extent practicable; and

(3) provide[] that any environmental review, analysis, opinion, permit, license, or approval that must be issued or made by a Federal agency or airport sponsor for such

Federal Aviation Act provides that:

> (a) Developing civil aeronautics and Safety of Air Commerce.--The Administrator of the Federal Aviation Administration shall encourage the development of civil aeronautics and safety of air commerce in and outside the United States. . . .

> (c) Airport capacity enhancement projects at congested airports.--In carrying out subsection (a), the Administrator shall take action to encourage the construction of airport capacity enhancement projects at congested airports as those terms are defined in section 47176.[4]

A CEP is "a project for construction or extension of a runway, including any land acquisition, taxiway, or safety area associated with the runway or runway extension" and "such other airport development projects as the Secretary [of Transportation] may designate as facilitating a reduction in air traffic congestion and delays."  49 U.S.C. § 47175(3).  The goal of the CEP at PHL is to "reduce the total delays at PHL, reduce the costs of delays, and reduce PHL's contribution to delays in the National Airspace System (NAS)."  DEIS S-3.

By 2008, the FAA and the City of Philadelphia had begun developing a proposed

_____

> a project will be completed within a time period established by the Secretary [of Transportation], in cooperation with the agencies identified under subsection (d) with respect to the project.

49 U.S.C. § 47171(a).  The Secretary of Transportation selected the PHL project as one of thirteen high-priority projects nationwide that are subject to Presidential Executive Order 13274. DEIS S-2.  Designation as a "high-priority project" means the project is subject to expedited agency review and enhanced agency coordination.

[4]  Section 47176 is probably intended to reference Section 47175, which defines (a) "congested airport" as an "airport that accounted for at least 1 percent of all delayed aircraft operations in the United States in the most recent year" and (b) "airport capacity enhancement project" as stated *infra*.  No section 47176 of this title has been enacted.

plan. Cutler Aff. ¶ ¶ 1,3 (docket no. 29). As is required under law, a draft environmental impact statement[5]–*i.e.*, a DEIS–evaluating the effects of several proposals to reconfigure the runways at PHL was prepared by the FAA.[6] The DEIS examined a range of alternatives, but ultimately, two plans, Alternative A and Alternative B, were chosen for further analysis.[7] At the heart of this dispute is the fact that both plans would require the UPS facility, currently located in Tinicum, to be relocated to a new site, also in Tinicum. DEIS S-2.

In their complaint, plaintiffs seek a declaratory judgment that establishes their right to withhold consent, pursuant to 53 P.S. § 14161, to any purchase of land in Tinicum Township defendant may seek to negotiate in implementation of the CEP. Tinicum and

---

[5] Under the National Environmental Policy Act ("NEPA") federal agencies must prepare a "detailed statement" on the potential impact of the proposed project when those projects "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C). Such a statement, called an environmental impact statement ("EIS"), see *Allegheny Def. Project, Inc. v. U.S. Forest Serv.,* 423 F.3d 215, 220 (3d Cir. 2005), must address five topics: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

[6] In preparing this document, the FAA consulted with state and federal agencies, published notice of the plan in the *Federal Register*, and held several public meetings. DEIS S-1. The FAA's Record of Decision on the CEP is expected in December 2010. Def. Mem. Existence of Case or Controversy 5 (docket no. 28).

[7] In August 2010, the Federal Aviation Administration issued its Final Environmental Impact Statement ("FEIS"), which selected Alternative A as the "preferred alternative" for implementing the CEP. The parties did not present the FEIS to this court.

the County have informed the court that they are willing to consent to the purchase of the land currently occupied by UPS, but refuse to consent to the purchase of land at the site required for the relocation of UPS. The state statute plaintiffs rely on provides that:

> All cities of the first class within this Commonwealth are hereby authorized and empowered to acquire by lease, purchase, or condemnation proceedings any land lying either within or, with the consent of the local authorities where such land is situated without the limitations of said city which, in the judgment of the corporate authorities thereof, may be necessary and desirable for the purpose of establishing and maintaining municipal airdromes or aviation landing fields.

53 P.S. § 14161. In plaintiffs' view, this statute requires that defendant obtain their consent in order to implement any part of the CEP that requires the purchase of land in Tinicum.

On June 25, 2009, the City of Philadelphia filed a Notice of Removal in this court. The City filed its Answer, Affirmative Defenses, and Counterclaims on July 2, 2009. The City's counterclaims seek declaratory and injunctive relief under federal and state law. The first counterclaim seeks injunctive relief prohibiting plaintiffs from: (1) refusing to grant consent to the acquisition of land by the City for purposes of the CEP and (2) obstructing the CEP and interfering with the Federal Aviation Authority's determination of reasonable alternatives for the CEP. In support, defendant relies on the Supremacy Clause for the proposition that § 14161 is preempted by federal law. The second and third counterclaims seek declaratory relief. Counterclaim II seeks a declaratory judgment establishing that under the Supremacy Clause, § 14161 is unconstitutional and preempted

by federal law.[8]  Count III seeks a declaration of state law establishing that:  (1) the

consent of Tinicum and the County is not required under § 14161 and (2) the consent

provisions of that statute are superseded by the City's Home Rule Charter with respect to

the voluntary purchase and sale of land.

On July 21, 2009 plaintiffs filed a Motion to Remand to State Court and in the

Alternative to Dismiss Counterclaims.  On August 18, the City filed two separate reply

briefs, one in opposition to plaintiffs' request for remand and one in opposition to the

motion to dismiss.  The plaintiffs also filed two separate briefs on September 3, 2009.  On

September 8, 2009, the City filed a request for oral argument.

On November 24, 2009, this court heard oral argument on the issue of whether to

remand this case to state court.  Following oral argument, this court found that plaintiffs'

cause of action raised a substantial federal question and held that it had jurisdiction

pursuant to 28 U.S.C. § 1331.  *See Franchise Tax Bd. of Cal. v. Constr. Laborers*

*Vacation Trust*, 463 U.S. 1, 13 (1983) (finding that federal jurisdiction exists over a state-

law claim where the state-law claim "necessarily depends on resolution of a substantial

question of federal law").  Accordingly, this court denied plaintiffs' motion for remand

and plaintiffs' motion for attorneys' fees was dismissed as moot.  This court then asked

for supplementary briefing on the issue of whether a case or controversy exists in this

---

[8]  More specifically, defendant asked for a declaratory judgment stating the following: (1) Tinicum and the County may not claim the benefit of §1461 to bar acquisition of lands by the City for the CEP' (2) § 14161 is unconstitutional and preempted by the Supremacy Clause as applied to the CEP; and (3) the City need not obtain consent from either Tinicum or the County before purchasing land located in Tinicum or the County that is required for the CEP.

case.  Plaintiffs joined defendant's submission, filed on January 15, 2010.  After examining the submissions, this court was satisfied that this case presents a case or controversy under Section 2 of Article III.

On March 22, 2010, plaintiffs informed this court that they would seek dismissal only of defendant's third counterclaim–which seeks a declaratory judgment interpreting state law–rather than all three counterclaims.  On April 12, 2010, plaintiffs filed a motion for judgment on the pleadings, asking for a declaration that "[53 P.S. § 14161] is valid and requires Defendant, City of Philadelphia, to obtain Plaintiffs' consent prior to purchasing any land located in Tinicum Township or Delaware County for use as an airport."

On May 10, 2010, the City of Philadelphia, filed a cross-motion for judgment on the pleadings.  Defendant argued that: (1) notwithstanding § 14161, the City has authority under state law to purchase land from willing sellers; and (2) if, § 14161 has the force under state law plaintiffs' assert, federal preemption bars plaintiffs from relying on § 14161 to block the City's purchase of land in Tinicum.  The City requested a judgment declaring that "neither the Township of Tinicum, nor Delaware County may invoke 53 P.S. § 14161 to prevent the City from purchasing land within the Township of Tinicum in connection with a federally-approved [CEP] at [Philadelphia International Airport]." City Cross-Mot. Judg. Plead. Prop. Order (docket no. 36).  The City also requested a permanent injunction barring plaintiffs from "taking any action to defeat, interfere with or

impair in any way the City's ability to purchase land within the Township of Tinicum for a CEP at the Airport that is approved by the Federal Aviation Administration." City Cross-Mot. Judg. Plead. Proposed Order.

On July 12 and 13, 2010, this court held oral argument on: (1) plaintiffs' motion to dismiss defendant's third counterclaim; (2) plaintiffs' motion for judgment on the pleadings; and (3) defendant's cross-motion for judgment on the pleadings. On July 13, the court ruled from the bench that, as a matter of state law, § 14161 has not been qualified or modified by subsequent action in the Pennsylvania legislature. In consequence, as a matter of state law, § 14161 remains in force vesting in Delaware County and Tinicum Township authority to refuse assent to any proposed purchase by the City of Philadelphia, as owner of the Philadelphia Airport, of land in the Township or County sought for the purpose of enlarging the airport (copy of bench opinion attached to this opinion as Appendix B). In accordance with this ruling this court granted plaintiffs' motion to dismiss defendant's third counterclaim. Because the City's argument that state law barred invocation of § 1461 had failed, the remaining question raised in the cross-motions for judgment on the pleadings was whether the Federal Aviation Act preempts § 14161.

## II.

Because the essence of this dispute relates to specific proposed alterations to the physical landscape of the airport, it is useful to examine the layout of the airport and the

changes set forth in the CEP in greater detail.

Currently, the airport relies on two primary runways.  The first, Runway 9R-27L, is 10,500 feet long and the second, Runway 9L-27R, is 9,500 feet long.  DEIS S-2.  In addition, the airport has two secondary runways:  Runway 17-35, which is 5,459 feet long, and Runway 8-16, which is 5,000 feet long.  DEIS S-2.  According to the Federal Aviation Administration, the "major cause[]" of the delays and congestion at PHL is "inadequate all-weather airfield capacity due to the airfield's current configuration." DEIS S-2.  More specifically, six aspects of the runway layout contribute to the delays and congestion at PHL:

[(1)] The close spacing of the two primary runways (Runways 9R-27L and 9L-27R) prevents simultaneous arrivals or departures during poor weather.

[(2)] Runways 17-35 and 8-26 are currently not of an adequate length to accommodate most large aircraft; therefore, they are underutilized while the primary runways are congested.  Runway 17-35 will not accommodate large aircraft even when extended.

[(3)] Runway 8-26 can only be used in one direction because aircraft are not allowed to fly over the Passenger Terminal Complex.

[(4)] Runways 17-35 and 9L-27R intersect, which prevents simultaneous operations on both runways. Operations on one runway must be halted while the other runway clears, creating delay and reducing the capacity of both runways.

[(5)] Weather conditions influence the operational capacity of PHL. Under optimal conditions, where winds are from the west or are calm, PHL operates in West Flow and has an operational capacity of 104 operations per hour. West Flow is the preferred overall operating mode at PHL and generally occurs about 75 percent of the time. PHL's operational capacity is higher in the West Flow operation mode because the large majority of operations are conducted

in weather conditions where visibility is good and winds are light, which allows less separation between arriving and departing aircraft and use of all four runways. When weather conditions deteriorate, the Airport operates in East Flow and has a lower operational capacity of about 81 operations per hour. The operational capacity of PHL during East Flow, when winds are strong and from the east and/or visibility is poor, is considerably lower than during West Flow because greater separation is required between aircraft in low visibility weather conditions or in Instrument Meteorological Conditions (IMC) weather conditions where visibility is reduced and an airplane pilot must rely on instrument guidance for final approach and landing. The number of active runways is also reduced in IMC weather conditions.

[(6)] The taxiway system creates bottlenecks that delay taxiing aircraft and frequently create long queues.

DEIS S-4.  As a result, the "capacity" of the airport–as measured by "the number of passengers or aircraft operations that can be accommodated in a specific time period,"–is "constrained."  DEIS S-2.

Alternatives A and B proposed a number of changes to the existing runway system at PHL.  As set out in the DEIS:

Alternative A . . . would have five runways connected by a redesigned and more efficient taxiway system . . . . Runway 17-35 would remain as a 6,500-foot crosswind runway. This alternative would extend Runway 8-26 2,000 feet to the east, for a total length of 7,000 feet. This runway would continue to be unidirectional, serving westbound arrivals and eastbound departures.

Runway 9L-27R would remain at its current length (9,500 feet) and location. It would support westbound departures in West Flow, and eastbound arrivals in East Flow. This alternative would extend Runway 9R-27L to the east by 1,500 feet, to a total length of 12,000 feet. This runway would be renamed Runway 9C-27C.  It would function primarily as an arrival runway during West Flow operations and a departure runway during East Flow. A new runway, Runway 9R-27L, would be constructed 1,600 feet south of Runway

9C-27C.  This runway would be 9,103 feet long by 150 feet wide and would serve primarily as a departure runway in West Flow and an arrival runway in East Flow.

DEIS S-6.  Meanwhile, Alternative B:

> would have four runways connected by a redesigned and more efficient taxiway system. . . .

> This alternative would extend Runway 8-26 by 2,000 feet to the west, for a total length of 7,000 feet.  This runway would continue to be unidirectional, serving westbound arrivals and eastbound departures.  Runway 9L-27R would remain at its current length (9,500 feet) and location.  It would support departures in West Flow and arrivals in East Flow.  This alternative would extend Runway 9R-27L to the east by 1,500 feet, to a total length of 12,000 feet.  This runway would be renamed Runway 9C-27C.  It would function primarily as an arrival runway during West Flow operations and a departure runway during East Flow.  A new runway, Runway 9R-27L, would be constructed 1,600 feet south of Runway 9C-27C.  This runway would be 9,103 feet long by 150 feet wide, and would serve primarily as a departure runway in West Flow and an arrival runway in East Flow. . . .

DEIS S-8.  In short, the relevant part of the two plans call for the following:  (1) reconfigure the airfield to provide four east-west parallel runways by extending runway 8-26; (2) extending existing runway 9R-27L and renaming it runway 9C-27C; and (3) adding a new runway near the Delaware River named 9R-27L.  This last step would require the airport to fill 24.5 acres of the Delaware River and use land currently occupied by the UPS facility.

Using simulations, the FAA estimated that Alternative A would result in an average delay of 5.2 minutes in 2020 and 8.4 minutes in 2025.  DEIS S-7.  Alternative B would result in an average delay of 4.7 minutes in 2020 and 7.1 minutes in 2025.  When

compared to the "The No-Action Alternative," which involves only periodic maintenance and minor enhancements needed to maintain safe operations at PHL, it is clear that Alternatives A and B would decrease delays at PHL. DEIS S-6. The CEP is administratively viewed as necessary because "PHL is currently one of the most delay-prone airports in the [national airspace system], and delays are predicted to worsen in the future as aviation demand increases." DEIS S-3. Given that the No-Action Alternative fails to alleviate congestion, the FAA concluded that only Alternative A and Alternative B were feasible plans.

III.

Plaintiffs and defendant have both moved for judgment on the pleadings. Under Federal Rule of Civil Procedure 12(c), judgment on the pleadings may occur after the period for pleadings has ended, but before trial. Judgment on the pleadings is appropriate only if "the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290-91 (3d Cir. 1988)). In certain circumstances, it is appropriate for a court to treat a motion for judgment on the pleadings as one for summary judgment pursuant to Federal Rule of Civil Procedure 56(c):

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 and all parties shall be given reasonable opportunity to present all material made

pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(d). Before converting a motion for judgment on the pleadings, a district court must "give[] notice and an opportunity to oppose summary judgment." *Otis Elevator Co. v. George Washington Hotel Corp.*, 27 F.3d 903, 910 (3d Cir. 1994) (citing *Davis Elliott Intern. v. Pan Am. Container*, 705 F.2d 705, 707-08 (3d Cir.1983)). This court finds that conversion of the motions into ones for summary judgment is appropriate in this case.[9]

A party is entitled to summary judgment " if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, this court will view the facts and inferences to be drawn from the pleadings in the light most favorable to the non-moving party. *Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*,

---

[9] The parties have received adequate notice of the possibility of conversion to summary judgment. *See Chase Manhattan Bank v. BCE Mobile Commc'ns Inc.*, ___F.Supp.2d ___, 2010 WL 2757502 (D. Del. 2010) (notice of converting a motion for judgment on the pleadings into one for summary judgment has been "established where outside materials were attached to the Motion for Judgment on the Pleadings [and] there has been ample time to present evidence in opposition."). The three parties have relied on a number of matters outside the pleadings, including affidavits and the DEIS. Plaintiffs have also asked the court to consider an article about the airport recently published by the *Philadelphia Inquirer*. Pl. County Del. Sur-Rep. 3 (docket no. 46). In addition, the parties have submitted motions for judgment on the pleadings, and thus have had an opportunity to challenge the arguments put forward by the other side. Plaintiffs and defendant agree that there are no issues of material fact requiring fact-finding by the court or a jury.

931 F.2d 1002, 1005 (3d Cir. 1991).

IV.

As noted above, on July 13, 2010, I ruled from the bench that, as a matter of Pennsylvania law, §14161 remains in force, vesting in plaintiffs Tinicum Township and Delaware County authority to refuse assent to a purchase by defendant City of Philadelphia, as owner of the Philadelphia airport, of land in the Township or County sought by defendant for the purpose of enlarging the airport. The remaining question is whether § 14161, while authoritative as a matter of state law, is, nevertheless, as a matter of federal preemptive law, barred by the Federal Aviation Act.

Defendant does not contend that any provision of the FAA expressly provides that § 14161 must yield place to the FAA. Defendant does, however, contend that provisions of state law like § 14161 are preempted by the FAA by implication. Two alternative forms of implied preemption are invoked–"field preemption" and "conflict preemption." Field preemption signifies that federal legislation has so fully occupied a regulatory field that there is no room for any type of state regulation in that field. Conflict preemption, much narrower in scope than field preemption, signifies that a particular state regulation, if permitted to operate, would impede or wholly foreclose the exercise by, or on behalf of, or by delegation from, the federal government of a particular federal function.

I will now proceed to examine whether either of these twin forms of implied federal preemption has application in this case.

Recognition that the federal government can occupy a field so completely as to bar state intervention of any kind goes far back in our constitutional history. *See Prigg v. Pennsylvania*, 41 U.S. 539 (1842) (Fugitive Slave Act of 1793, establishing federal procedures for recovery of fugitive slaves, ruled a constitutional implementation of Constitution's Fugitive Slave Clause, and held to occupy field and thereby invalidate Pennsylvania's somewhat similar, but in certain respects discrepant, scheme for recovery of fugitive slaves).

In the case at bar defendant contends that capacity enhancement projects, such as this one, developed for the PHL under the supervision of the Federal Aviation Administrator, are among the FAA's chief instruments for developing the American aviation industry, and that the promotion of air safety is a central ingredient of the CEP process. It is further contended that air safety is a field wholly occupied by the federal government, through the FAA, and hence closed to state regulation of any kind.

The proposition that relieving congestion at the nation's major airports is a key aspect of the promotion of air safety hardly needs argument. Too many planes waiting to take off and to land is a phenomenon fraught with risk. Moreover, the FAA has found that PHL is "one of the airports contributing to delays throughout the national airspace system." DEIS S-1. When air traffic at PHL is acutely backed up, with large delays in plane arrivals and departures, those delays can be expected not merely to cause delays in

other airports but, by the same token, to aggravate risk factors in other airports as well.

The Federal Aviation Act reflects Congress' direct recognition of these safety concerns. Pursuant to 49 U.S.C. §40104(a), "[t]he Administrator of the Federal Aviation Administration" has long been charged with the duty of "encourag[ing] the development of civil aeronautics and safety of air commerce in and outside the United States." Among the many amendments of the FAA embodied in the Vision 100 Act of 2003 was the addition to §40104 of a subsection (c) which provides: "In carrying out subsection (a), the Administrator shall take action to encourage the construction of airport capacity enhancement projects at congested airports as those terms are defined in §47176."[10] Moreover, Section A, Section 302 of Title III of the Vision 100 Act contains several congressional findings, the third of which is of particular salience: "Congress finds that . . . (3) airport capacity enhancement projects at congested airports are a national priority and should be constructed on an expedited basis." Pub.L. 108-176, Title III, § 302, Dec. 12, 2003, 117 Stat. 2533.

The FAA defines a "capacity enhancement project "as a "project for construction or extension of a runway, including any land acquisition, taxiway, or safety area associated with the runway or runway extensions, together with such other airport development projects as the Secretary [of Transportation] may designate as facilitating a reduction in air traffic congestion and delays." 49 U.S.C. § 47175(3).

_____

[10] As stated in note 4, *supra*, Section 47176 is probably intended to reference Section 47175.

As the factual recital in Part I of this opinion explains, the predicate for the CEP developed for PHL was a Draft Environmental Impact Statement (DEIS) which proposed two alternative plans for expanding PHL's capacity, both of which involved extending existing runways and constructing a new runway. Both plans required acquiring additional land. The additional land was found to be necessary to provide a site to which the existing UPS facility can be moved. Relocation of the UPS facility is required because the land it now occupies would be needed in order to construct the new runway. Extending two of the existing runways and adding a new runway are deemed essential to making PHL a markedly less congested–and hence a safer– airport.

In sum, making the PHL airspace safer is a key ingredient of the CEP developed for PHL–a CEP whose execution will require the acquisition of land in Tinicum Township.

### B. Is Airspace Safety a Field Wholly Occupied by the FAA to the Exclusion of State Regulation?

In 2007 the Ninth Circuit, in concluding that the FAA displaced an application of California tort law, identified the central reason for finding that the FAA had preemptive force. Speaking through Judge Schroeder, the court said: "The purpose, history, and language of the FAA lead us to conclude that Congress intended to have a single, uniform system for regulating aviation safety. The catalytic events leading to the enactment of the FAA helped generate this intent." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir.

2007).  The court went on to recall those "catalytic events":

> The FAA was drafted in response to a series of fatal air crashes between civil
> and military aircraft operating under separate flight rules . . . To avoid future
> disasters and, as we have expressed it, "to promote safety in aviation and
> thereby protect the lives of persons on board aircraft ". . .Congress enacted the
> FAA, "the whole tenor [of which was] to create and enforce one unified
> system of flight rules."

*Id.* (citations omitted).

 In corroboration of the preemptive impact of the FAA's "purpose, history, and

language," the *Montalvo* court looked back thirty-four years to *City of Burbank v.*

*Lockheed Air Terminal*, 411 U.S. 624 (1973).  There the Supreme Court ruled that a

Burbank ordinance barring jet aircraft from taking off from the Burbank airport between

11:00 p.m. and 7:00 a.m. infringed on the preemptive regulatory authority of the

Administrator of the Federal Aviation Administration conferred by the FAA and the

Noise Control Act of 1972.  In explaining their ruling, the five Justices of the majority,

speaking through Justice Douglas, observed:

> The Federal Aviation Act requires a delicate balance between safety and
> efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground.
> 49 U.S.C. § 1348(c).  Any regulations adopted by the Administrator to control
> noise pollution must be consistent with the "highest degree of safety."  49
> U.S.C. § 1431(d)(3). The interdependence of these factors requires a uniform
> and exclusive system of federal regulation  if the congressional objectives
> underlying the Federal Aviation Act are to  be fulfilled.

*Id.* at 638-639.  The four dissenting Justices in *City of Burbank* did not view the Burbank

ordinance at issue as trespassing on the federal domain, but, speaking through Justice

Rehnquist, they made it plain that they shared the majority's assessment of the comprehensive preemptive impact of the FAA:

> The 1958 Act [the FAA] was intended to consolidate in one agency in the Executive Branch the control over aviation that had previously been diffused within that branch.  The paramount concerns of Congress were to regulate federally all aspects of air safety, *see, e.g.* 49 U.S.C. § 1422 and, once aircraft were "in flight," airspace management, *see, e.g.* 49 U.S.C. § 1348(a).

*Id.* at 644.

The Ninth Circuit's ruling in *Montalvo* is in harmony with decisions of other courts of appeals that have, in dicta or in holdings,[11] recognized the FAA's preemptive scope in conformity with the Supreme Court's treatment of the issue in *City of Burbank.* Prominent among the holdings have been two rulings of the Third Circuit.  In *Abdullah v. American Airlines, Inc.,* 181 F. 3d 163, 165 (3d Cir. 1999), the court ruled that the FAA preempts "the entire field of aviation safety."  The ruling came in a tort suit brought against American Airlines by passengers alleging that they had been injured in a turbulent flight from New York to Puerto Rico.  The airline was at fault, the *Abdullah* plaintiffs

---

[11] *See Air Transport Ass'n of America, Inc. v. Cuomo*, 520 F.3d 218, 224 (2d Cir. 2008) ("Insofar as the [New York Passenger Bill of Rights] is intended to prescribe standards of airline safety . . . it may also be impliedly preempted by the FAA . . .[T]he FAA 'was passed by Congress for the purpose of centralizing in a single authority-indeed, in one administrator-the power to frame rules for the safe and efficient use of the nation's airspace.'") (citing *Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960)); *Greene v. B.F. Goodrich Avionics Systems, Inc.,*; 409 F.3d 784, 795 (6th Cir. 2005) ("We agree . . .  [that] federal law establishes the standards of care in the field of aviation safety and thus preempts the field from state regulation."), *cert. denied,* 547 U.S. 1003 (2006); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 4 (1st Cir. 1989) (Rhode Island statute regulating drug testing of pilots was preempted by federal law because "Congress intended to occupy the field of pilot regulation related to air safety").

contended, in that the crew had not, in conformity with Pennsylvania law, properly warned passengers about turbulence and its attendant dangers.  The Third Circuit ruled that, with respect to inflight injuries, the applicable standard of care was determined, due to federal preemption, not by Pennsylvania law but by federal law.  The precise contours of *Abdullah* have very recently been clarified by the Third Circuit in *Elassaad v. Independence Air, Inc.,* ____F.3d____, 2010 WL 2653206 (3d Cir. July 6, 2010).  In *Elassaad*, the plaintiff was a passenger on a small computer plane from Boston to Philadelphia.  An amputee, Elassaad used crutches.  On the plane's arrival in Philadelphia, Elassaad, the last passenger to deplane, started down the narrow staircase, with a railing only on the left side, that was built into the plane.  Losing balance, Elassaad fell off the right side of the staircase to the tarmac, injuring his right shoulder.  Elassaad's resultant suit in the Court of Common Pleas was removed to this court on diversity grounds.  Elassaad argued that the failure of airline personnel to offer him assistance was negligence under Pennsylvania law.  The airline contended that federal law governed, and under federal law assistance was required only when requested by the passenger.  On the authority of *Abdullah,* the district court granted summary judgment, dismissing Elassaad's suit.  The Court of Appeals reversed: "Although we stated in *Abdullah* . . . that the Aviation Act preempts 'the entire field of aviation safety' from state regulation, we hold that the 'field of aviation safety' does not include a flight crew's oversight of the disembarkation of passengers once a plane has come to a complete stop at its

destination." _____F.3d_____. What *Elassaad* holds, in short, is that "once a plane has come to a complete stop at its destination," the federal law of air safety has run its course and state law takes over.

As the tort remedies available to an airline passenger who has disembarked at his destination are remote from federal preemption, the nexus between air safety and the construction and reconstruction of airport runways and adjacent areas, including taxiways, is at the heart of federal preemption. The latter point was brought sharply into focus many years ago in *Burbank–Glendale–Pasadena Airport Auth. v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992), a case strikingly similar to the case at bar.[12] At issue was a city ordinance enacted just before the airport was about to undertake the extension of a taxiway paralleling the airport's principal north-south runway. The conflict between the taxiway extension project and the ordinance arose as follows:

> The ordinance at issue applies exclusively to a 54-acre parcel of land owned by the Burbank Airport and located within the jurisdiction of the City fo Los Angeles. When this lawsuit was filed, this parcel of land contained the northern portion of the Airport's main north-south runway and an associated taxiway (Taxiway A) which runs parallel to this runway on the east side and extends all the way to the runway's northernmost end. At that time, the parallel taxiway on the west side of the runway (Taxiway B) stopped short of the runway's northern end, terminating right at the edge of the Los Angeles boundary. This deficiency in Taxiway B posed a safety risk because it forced all aircraft approaching from the western part of the Airport to cross over the runway at its midpoint in order to begin their takeoffs from the north end of the runway.

---

[12] There is one descriptive, but, from a doctrinal perspective, non-pertinent difference between the cases: In *Burbank-Glendale-Pasadena Airport* the airport was not city-owned. The City of Los Angeles was the airport's adversary, playing the role of Tinicum Township and Delaware County in the case at bar.

In 1985, the Burbank Airport began to seek initial approval for a plan to lengthen Taxiway B so that it would extend all the way to the northern end of the north-south runway. This taxiway extension project was expected to produce significant safety improvements as well as noise benefits.

On June 12, 1990, right before construction was to begin on the taxiway extension project, the Los Angeles City Council enacted Ordinance No. 165, 972 ("the Ordinance"), which required the Airport to submit every proposed development project–specifically including runway and taxiway construction and reconstruction-to the City Planning Commission for prior review and approval.

*Id.* at 1339.

In a suit brought by the airport to enjoin enforcement of the ordinance, the district court granted summary judgment in favor of the airport. The Ninth Circuit affirmed. The court explained its ruling as follows:

The problem with this Ordinance is that it conditions the construction and reconstruction of taxiways and runways on the prior approval of the City. This the City may not do. The proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace. The regulation of runways and taxiways is thus a direct interference with the movements and operations of aircraft, and is therefore preempted by federal law.

*Id.* at 1340. Section 14161 is preempted for the same reason that the ordinance of the Los Angeles City Council was preempted.

## C. Conflict Preemption[13]

_____

[13] Discussion of the applicability of conflict preemption may be viewed as superfluous, since the foregoing discussion of field preemption leads to the conclusion that the FAA occupies the entire field of aviation safety, thereby preempting § 14161. As a matter of process, it is, of course, the general understanding that the minimalist conventions restraining judicial practice suggest that a court, after arriving at one dispositive ruling, should call a halt, not exploring other

Section 14161, like the Los Angeles ordinance, goes beyond entry into a field preemptively occupied by federal authority.  Section 14161, like the Los Angeles ordinance, impinges directly, in targeted fashion, on the exercise of a federal function, conditioning exercise on the approval of a non-federal entity. That this cannot pass constitutional muster has been clear ever since the decision, in 1819, of *McCulloch v. Maryland*, 4 Wheat. (17 (U.S.) 316 (1819).  *Cf. Gibbons v. Ogden*, 9 Wheat. (22 U.S.) 1 (1824) and compare the concurring opinion of Justice Johnson, *id*. at 222.

VI.

For these reasons, I will deny plaintiffs' motion for judgment on the pleadings and grant defendant's cross-motion for judgment on the pleadings.  A declaratory judgment and permanent injunction shall issue.  An appropriate order accompanies this opinion.

---

possible pathways to the already-determined result. In this instance, I am not proceeding in conformity with convention:  The two modes of preemption under consideration are, given the facts of record, markedly similar in impact.  It seems to me, therefore, sensible to examine both of these doctrinal siblings.  By following this course, I will provide the Court of Appeals, if this judgment is appealed, the benefit (query whether "benefit" would be regarded by the Court of Appeals as the apt word?) of my thinking with respects to both approaches to the preemption question.